[No. D029568. Fourth Dist., Div. One. Mar. 30, 1998.]

DENNIS H. GOEHRING et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JUDITH E. BERNIER et al., Real Parties in Interest.

898

## COUNSEL

Sheppard, Mullin, Richter & Hampton, Victor A. Vilaplana, Karin Dougan Vogel, Linda D. Fox and Lei K. Udell for Petitioners.

No appearance for Respondent.

Milberg, Weiss, Bershad, Hynes & Lerach, William S. Lerach, Patrick J. Coughlin, Anita Meley Laing, William S. Dato, Sheri Pym, Finkelstein & Associates, Howard D. Finkelstein, Mark L. Knutson, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, Morrie Much, Michael B. Hyman, Calhoun, Benzin, Kademenos & Heichel, William D. Heichel, James L. Childress, Cohen, Milstein, Hausfeld & Toll, Herbert E. Milstein, Lisa M. Mezzetti, Kaplan, Kilsheimer & Fox and Richard J. Kilsheimer for Real Parties in Interest.

## OPINION

**HALLER, J.**—Judith E. Bernier and others (plaintiffs) purchased pay telephone units as investments from Amtel Communications, Inc. (Amtel), a California corporation. After Amtel filed for bankruptcy, plaintiffs filed a class action alleging the investment scheme was fraudulent and violated several California statutes. Plaintiffs named numerous defendants, including Texas residents Dennis H. Goehring and Pete William Catalena, general partners of a Texas partnership that sold pay telephone units to Amtel. Goehring and Catalena (sometimes petitioners) petitioned for writ of mandate, challenging the trial court's order denying their motion to dismiss for lack of personal jurisdiction. We grant the writ of mandate, and order the trial court to vacate its denial of the dismissal motion. We order the court to rule on plaintiffs' discovery request and, based on that ruling, to enter a new order on petitioners' dismissal motion consistent with this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The Complaint*

As is relevant here, plaintiffs' complaint alleges the following.

Each plaintiff purchased a pay telephone unit from Amtel under a "sale-leaseback" investment program. Under this program, Amtel sold a pay telephone unit and a leased site location to the investor, who immediately leased the unit back to Amtel. Amtel guaranteed it would repurchase the telephone unit after five years for the same price paid by the investor. Amtel promised monthly payments reflecting a 17 to 19 percent annual return. Plaintiffs allege Amtel misrepresented the nature and safety of the investment and that the investment program was a "Ponzi" scheme in which funds obtained from later investors provided cash to pay the amounts promised to earlier investors.

Beginning in 1990, Amtel purchased pay telephones and related component parts from two Florida manufacturers. However, by late 1993, Amtel had sold more units than its inventory. In response, Amtel approached defendants Goehring and Catalena, "who were then conducting business as Texas Coinphone, a Texas general partnership." Texas Coinphone owned and operated "hundreds of pay telephone units installed throughout Texas and other parts of the southwestern United States." In August 1994, Texas Coinphone and Amtel entered into an agreement whereby Coinphone agreed to sell 521 of its Texas-based telephone units to Amtel for $1,321,000. Amtel paid $271,000 in cash and executed six secured promissory notes for the balance of the purchase price.

Before the sale, Goehring and Catalena investigated Amtel's business and financial operation and, based on this investigation, "knew that title to [the] [telephone] units was being intentionally misrepresented by Amtel . . . [and] Coinphone knew, recklessly disregarded, or reasonably should have known that Amtel's sale-leaseback program was a classic Ponzi scheme and that funds invested by later investors were used to pay the lease payments to earlier investors in the sale-leaseback program." "[A]rmed with this knowledge not available to the investing public," these defendants "took steps to protect themselves at the expense of the investing public by requiring Amtel to provide them an asserted security interest in the telephone equipment sold to Amtel and further protected themselves by obtaining an assignment of Amtel's rights under the separate contracts between Amtel and the lessors of the investors' pay telephone site locations." Texas Coinphone "acquired [the] purported security interests and assignment of leasehold rights despite [its] knowledge that Amtel represented that the pay telephone units would be free and clear of all liens. . . . Goehring and Catalena learned of Amtel's scheme and voluntarily participated in and/or aided and abetted the other defendants' continuation of the [scheme] for Coinphone's profit at the expense and to the damage of plaintiffs and other class members."

As against Texas Coinphone and its individual partners, the complaint alleged (1) fraud; (2) conspiracy to defraud; (3) unlawful, fraudulent, and

unfair business practices (Bus. & Prof. Code, § 17200); (4) false and misleading advertising (Bus. & Prof. Code, §§ 17200, 17500); (5) negligence and negligent misrepresentation; and (6) state securities law violations (Corp. Code, §§ 25110, 25400).

### B. *Petitioners' Motion and Evidentiary Showing*

Texas Coinphone appeared and answered the complaint.

Petitioners specially appeared and moved to dismiss the complaint against them as individuals for lack of personal jurisdiction. In support of their motion, Goehring and Catalena submitted declarations establishing they are Texas residents, were served with the complaint in Texas, and have not had any contact with California other than as general partners of Texas Coinphone.[1] Petitioners argued that under Texas and California law, a partnership is an entity legally distinct from its partners and therefore any actions they "may have taken in California in their capacity as partners of Texas Coinphone or the activities of Texas Coinphone in California should not be considered by the Court in determining whether [they] are individually subject to the jurisdiction of California."

Petitioners also presented evidence describing Texas Coinphone's contacts with Amtel, which consisted of a single sales transaction on August 16,

---

[1]Each declaration stated: "I am a general partner of Texas Coinphone . . . a Texas general partnership. . . . [¶] . . . I file . . . my Federal Income Tax Returns separate . . . from the returns·filed by Texas Coinphone. . . . [¶] . . . I am . . . a resident and citizen of the state of Texas. . . . [¶] [M]y domicile is . . . in Texas. [¶] I received a copy of the summons and Complaint in Texas . . . . [¶] I [do not] maintain . . . a registered agent for service in California. [¶] I do not own, lease, possess or maintain any real or personal property in California, and have not owned, leased, possessed or maintained any real or personal property in California. [¶] I do not own, lease or maintain an office, residence or place of business in California, and I have not owned, leased or maintained an office, residence or place of business in California. [¶] I have never had an authorized agent or representative in California. [¶] I do not and have not . . . paid taxes of any kind in the state of California. [¶] I do not maintain any bank or savings and loan accounts in California and have not maintained any bank or savings and loan accounts in California. [¶] I do not own [and have not owned] stocks, securities, negotiable or non-negotiable instruments, or commercial paper of any kind in California . . . . [¶] I have never performed any service or sold any goods in California. [¶] I have not and do not derive substantial revenue from goods used or consumed in California or services rendered in California. [¶] I do not engage in a business and have not engaged in business in the state of California. . . . [¶] I have never recruited employees in California. [¶] I have never signed any contracts in California. [¶] Neither presently nor at any time relevant and material to the Controversy have [I] maintained a telephone listing in California. [¶] Neither presently nor at any time relevant and material to this Controversy have [I] entered into a contract or other relationship with Plaintiffs in the state of California. [¶] Neither presently nor at any time relevant and material to the Controversy have I entered into a contract with the Plaintiffs to be performed in California. . . ."

1994. Petitioners proffered four sets of documents relating to that sale: (1) the written sales agreement; (2) the related promissory notes and collection and escrow agreement; (3) a security agreement; and (4) a California UCC-1 financing statement. Because these documents formed the basis for the trial court's jurisdiction finding, we describe the documents in some detail below.

First, in the August 1994 written agreement, Texas Coinphone agreed to sell Texas-based pay telephone units to Amtel. The contract states the transaction is governed by Texas law. Petitioners executed the agreement in Texas as general partners of Texas Coinphone. Amtel agreed to pay $1,371,000, consisting of a $271,000 cash payment and six promissory notes payable to Texas Coinphone. The agreement states "[p]ayment of the Notes shall be secured by a Security Agreement . . . covering and describing the Subject Properties . . . and a financing statement(s) . . . [and] other documents . . . to evidence and perfect [Texas Coinphone's] security interest in the [secured property]."

Second, petitioners submitted Amtel's six promissory notes referred to in the sales agreement. Texas Coinphone is the payee on each of the notes. The notes state the applicable interest rate is governed by Texas law. The related collection and escrow agreement requires Amtel to make specified payments to a Texas bank and/or to Texas Coinphone in its Texas offices.

Third, petitioners proffered the August 1994 security agreement wherein Amtel granted Texas Coinphone a security interest in Amtel's equipment and inventory, including the pay telephone units and related contracts. Goehring signed the security agreement as a general partner of Texas Coinphone. The agreement states it is governed by Texas law and prohibits Amtel from removing any of the telephone units from Texas. The agreement further states that any action by Amtel against Texas Coinphone must be brought in a state court in Brazos County, Texas or in a federal court in Texas's Southern District.

Fourth, petitioners submitted a California UCC-1 financing statement, creating a priority interest on Amtel's equipment and inventory, including the pay telephone units and related contracts. The statement was filed with the California Secretary of State's office in Sacramento, California and identifies the secured party as "Texas Coinphone, a Texas General Partnership." Goehring signed the statement as a general partner of Texas Coinphone. Goehring's declaration states he "did not execute the financing statement in [his] individual capacity."

In addition to submitting these four sets of documents, each petitioner stated in his declaration: "I have not done or caused to be done any act in

California with respect to any of Plaintiffs' causes of action. [¶] I have not caused tortuous [*sic*] injury to any Plaintiff by any act or omission in California."

## C. *Plaintiffs' Response*

In opposing petitioners' motion, plaintiffs did not submit any additional evidence and instead relied on petitioners' submitted documents. Plaintiffs argued the documents demonstrated sufficient contacts with California to support personal jurisdiction over the individual partners, maintaining that because the partners were jointly and severally liable with the partnership, the court's jurisdiction over Texas Coinphone means "it has equal jurisdiction of its two general partners." Plaintiffs alternatively requested the court provide them with the opportunity to conduct discovery "on the issue of the individual defendants' contacts with this state."

## D. *Trial Court's Ruling*

The trial court denied petitioners' motion, finding the documents established "defendants have sufficient contacts with California in their capacity as general partners of Texas Coinphone to confer limited personal jurisdiction over them for the purposes of this lawsuit." The court further found the exercise of jurisdiction "would not offend the notions of fair play and substantial justice," noting California's strong interest in providing a forum for the dispute and petitioners' failure to provide evidence showing the litigation "would pose a special hardship to them." Based on this ruling, the court did not reach the issue whether discovery was justified.

Petitioners filed this writ petition, challenging the court's assumption of jurisdiction over them as individuals.

## DISCUSSION

### I. *Applicable Jurisdiction Principles*

■ When a defendant moves to dismiss for lack of personal jurisdiction, ". . . the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, . . . it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, . . . the question

of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record. [Citation]." (*Vons Companies, Inc.* v. *Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085].)

■ California's long-arm statute permits California courts to exercise jurisdiction on any basis not inconsistent with the federal or state Constitution. (Code Civ. Proc., § 410.10.) Under the federal Constitution's due process clause, a court may assume jurisdiction over a nonresident defendant if the defendant has constitutionally sufficient "minimum contacts" with the forum state. (*Vons Companies, Inc.* v. *Seabest Foods, Inc., supra*, 14 Cal.4th at p. 444.) "The overriding constitutional principle is that maintenance of an action in the forum must not offend 'traditional conception[s] of fair play and substantial justice.' (*International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160 90 L.Ed. 95 (1945).) The defendant's 'conduct and connection with the forum State' must be such that the defendant 'should reasonably anticipate being haled into court there.' (*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).)" (*Sher* v. *Johnson* (9th Cir. 1990) 911 F.2d 1357, 1361; see *Vons Companies, Inc.* v. *Seabest Foods, Inc., supra*, 14 Cal.4th at pp. 444-448.)

A court may assert *general* jurisdiction over a defendant if the defendant's contacts with the forum state "are 'substantial . . . continuous and systematic.' [Citations]." (*Vons Companies, Inc.* v. *Seabest Foods, Inc., supra*, 14 Cal.4th at p. 445.) Where general jurisdiction cannot be established, a court may assume *specific* jurisdiction over a defendant in a particular case if the plaintiff shows: (1) "the defendant has purposefully availed himself or herself of forum benefits"; (2) the " 'controversy is related to or "arises out of" a defendant's contacts with the forum' "; and (3) the assertion of jurisdiction " 'would comport with "fair play and substantial justice." ' " (*Id.* at pp. 446-447; see *Sher* v. *Johnson, supra*, 911 F.2d at p. 1361.)

■ Plaintiffs rely on the specific jurisdiction doctrine to obtain personal jurisdiction over petitioners. It is undisputed petitioners' only contact with California was in their role as general partners of Texas Coinphone. At the trial court, petitioners argued these contacts could not be considered for purposes of determining specific jurisdiction because they were not contacts by the petitioners as individuals. Plaintiffs countered that jurisdiction over the partnership established jurisdiction over each individual partner. Neither of these contentions accurately reflects the law.

■ First, jurisdiction over a partnership does not necessarily permit a court to assume jurisdiction over the individual partners. "Liability and

jurisdiction are independent." (*Sher* v. *Johnson, supra*, 911 F.2d at p. 1365.) "Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum." (*Ibid.*) Although individual partners are jointly and severally *liable* for the torts of the partnership, "*jurisdiction* over each defendant must be established individually." (*Ibid.*, italics added; accord, *SBKC Service Corp.* v. *1111 Prospect Partners, L.P.* (D.Kan. 1997) 969 F.Supp. 1254, 1260.) Thus, a California court "has jurisdiction over only those individual partners who personally established the requisite minimum contacts with California." (*Sher* v. *Johnson, supra*, 911 F.2d at p. 1366; accord, Judicial Council of Cal., Com., Bases of Judicial Jurisdiction over Partnerships and other Unincorporated Associations, 14 West's Ann. Code Civ. Proc. (1973 ed.) foll. § 410.10, pp. 476-477.)

■ These principles, however, do not mean a general partner's contacts with the forum state are meaningless for purposes of the jurisdictional analysis. In their motion to dismiss and in their writ petition, petitioners argued the "fiduciary shield" doctrine insulates a general partner from jurisdiction based on his or her acts as a general partner. This contention is not supported by applicable authority.

As described in *Taylor-Rush* v. *Multitech Corp.* (1990) 217 Cal.App.3d 103 [265 Cal.Rptr. 672], the fiduciary shield doctrine prevents the exercise of personal jurisdiction over an individual whose activities were performed solely in a corporate or employment capacity. (*Id.* at pp. 114-118.) Although one California appellate court has suggested in dicta the applicability of the doctrine as applied to corporate officers in California (*Mihlon* v. *Superior Court* (1985) 169 Cal.App.3d 703 [215 Cal.Rptr. 442]), more recent courts have questioned the doctrine's continued validity, as have courts in many other jurisdictions. (See *Seagate Technology* v. *A.J. Kogyo Co.* (1990) 219 Cal.App.3d 696, 701-705 [268 Cal.Rptr. 586]; *Taylor-Rush* v. *Multitech Corp., supra*, 217 Cal.App.3d at pp. 114-117;[2] *Western Contracting Corp.* v. *Bechtel Corp.* (4th Cir. 1989) 885 F.2d 1196, 1199-1200; *Davis* v. *Metro Productions, Inc.* (9th Cir. 1989) 885 F.2d 515, 520-522; *Intermatic, Inc.* v. *Taymac Corp.* (S.D.Ind. 1993) 815 F.Supp. 290, 293-296; *State* ex rel. *Miller*

---

[2]*Taylor-Rush* held the fiduciary shield doctrine did not insulate New York corporate officers and directors from personal jurisdiction where these defendants made fraudulent misrepresentations purposely directed at plaintiff, a California resident. (*Taylor-Rush* v. *Multitech Corp., supra*, 217 Cal.App.3d at p. 117.) In *Seagate Technology,* the court determined a California court could properly assume jurisdiction over a nonresident corporate officer whose only contacts with the state were in a corporate capacity if (1) the officer's act was one for which the officer would be personally liable; and (2) the officer's act in fact created contacts between the officer and the forum state. (*Seagate Technology* v. *A.J. Kogyo Co., supra*, 219 Cal.App.3d at pp. 703-704.)

v. *Grodzinsky* (Iowa 1997) 571 N.W.2d 1, 3-6.) The *Seagate Technology* and *Taylor-Rush* courts noted the United States Supreme Court has implicitly rejected the fiduciary shield doctrine as a constitutional component of due process and therefore the doctrine is inconsistent with California's long-arm statute. (*Taylor-Rush* v. *Multitech Corp.*, *supra*, 217 Cal.App.3d at pp. 114-118; *Seagate Technology* v. *A.J. Kogyo Co.*, *supra*, 219 Cal.App.3d at p. 703; see *Calder* v. *Jones* (1984) 465 U.S. 783, 790 [104 S.Ct. 1482, 1487-1488, 79 L.Ed.2d 804]; see generally, 1 Casad, Jurisdiction in Civil Actions (2d ed. 1991) § 4.03[3], pp. 4-124 to 4-131.)

Further, petitioners have not asserted any reasoned basis for extending the corporate fiduciary shield doctrine to insulate *general partners* from liability. General partners are both agents and principals of the partnership. (Corp. Code, § 15009.) As such, they are jointly and severally liable for the acts of the partnership. If the *individual* partner's conduct establishes the basis for specific jurisdiction (i.e., purposeful availment, conduct related to the claim, and assertion of jurisdiction comports with fair play and substantial justice), the concepts inherent in the "fiduciary shield" doctrine—the perceived unfairness of forcing an individual to defend a suit where his or her acts were performed solely for the principal's benefit—will be appropriately addressed.

We decline to hold a general partner who is allegedly liable on substantive grounds may insulate himself or herself from jurisdiction merely because that partner has acted solely in his or her partnership capacity. (See *Sher* v. *Johnson*, *supra*, 911 F.2d at pp. 1365-1366 [evaluating individual law partner's contacts to evaluate jurisdiction over individual partners, but determining that such individual contacts were insufficient to establish "minimum contacts" between forum and any individual partner]; *Vandeveld* v. *Christoph* (N.D.Ill. 1995) 877 F.Supp. 1160, 1163 [although Illinois recognizes fiduciary shield doctrine as applied to corporate officials, it does not apply the doctrine to protect an individual general partner from the exercise of personal jurisdiction].)

Accordingly, although jurisdiction over Texas Coinphone did not automatically confer jurisdiction over petitioners, we may look at each petitioner's conduct as a general partner to determine whether there were constitutionally sufficient minimum contacts with California to impose jurisdiction over that individual.

## II. *Analysis*

The trial court found the following documents supported personal jurisdiction over petitioners: (1) Texas Coinphone's agreement with Amtel;

(2) the promissory notes and related escrow agreement; (3) the security agreement; and (4) the UCC-1 financing statement.

The first three sets of documents—the sales agreement, security agreement, and promissory notes/escrow agreement—are insufficient to establish jurisdiction because they do not establish petitioners *purposefully availed* themselves of forum benefits. ■ " 'Purposeful availment' requires that the defendant 'have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.' " (*Sher* v. *Johnson, supra,* 911 F.2d at p. 1362.) A contract with an out-of-state party does not automatically establish purposeful availment in the other party's home forum. (*Burger King Corp.* v. *Rudzewicz* (1985) 471 U.S. 462, 478 [105 S.Ct. 2174, 2185, 85 L.Ed.2d 528]; *Vons Companies, Inc.* v. *Seabest Foods, Inc., supra,* 14 Cal.4th at p. 450; *Sher* v. *Johnson, supra,* 911 F.2d at p. 1362.) Rather, a court must evaluate the contract terms and the surrounding circumstances to determine whether the defendant purposefully established minimum contacts within the forum. Relevant factors include prior negotiations, contemplated future consequences, the parties' course of dealings, and the contract's choice-of-law provision. (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at pp. 478-482 [105 S.Ct. at pp. 2185-2187].)

■ Applying these principles, petitioners did not purposefully avail themselves of California benefits by executing the sales, security and escrow agreements. The contract negotiations occurred in Texas. The sales and security agreements and promissory notes were governed by Texas law. The transaction documents were prepared by a Texas law firm. The transaction closed in Texas. The documents were executed in Texas and payments necessary to close the transaction were provided to a bank in Texas. The sales and security agreements concerned only *Texas-based* pay telephones that were required to remain in Texas; thus, all future consequences were in Texas.

Recognizing the lack of a California connection arising from the sales and security agreements, plaintiffs instead focus on the California UCC-1 financing statement, signed by general partner Goehring and filed in the California Secretary of State's office.

■ The filing of a financing statement gives notice to and assures priority over other creditors and interested third parties with respect to goods described in the security agreement. (Cal. U. Com. Code, § 9302; *New West Fruit Corp.* v. *Coastal Berry Corp.* (1991) 1 Cal.App.4th 92, 97 [1 Cal.Rptr.2d 664].) "The purpose of perfection is simply 'to make [the security interest] safe against creditors and transferees of the debtor.' " (*Turbinator, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 443, 451 [39 Cal.Rptr.2d 342].)

Goehring's filing of a single financing statement, considered alone or in connection with the sales and security agreements, does not demonstrate purposeful availment. The fact that Texas Coinphone needed to use a California procedure to protect its *Texas-based* security interests on *Texas* promissory notes relating to a *Texas-based* sales contract does not constitute a voluntary or purposeful effort to conduct business in California. As one federal court has noted, "[t]he filing of financing statements is not akin to soliciting business in the forum, introducing products into the forum, or signing and performing a contract within the forum." (*Occidental Fire & Cas.* v. *Continental Ill. Nat. Bk* (E.D.N.C. 1988) 689 F.Supp. 564, 568.) Other courts have reached identical conclusions. (See *NFD, Inc.* v. *Stratford Leasing Co.* (Minn.Ct.App. 1988) 433 N.W.2d 905, 909 [nonresident's filing of a UCC-1 financing statement did not show nonresident "purposefully availed itself of the benefits of the forum state's laws"]; *Prentice* v. *Prentice Colour, Inc.* (M.D.Fla. 1991) 779 F.Supp. 578, 588 [". . . the filing of Uniform Commercial Code financing statements in Florida by an out-of-state defendant to protect its security interests does not constitute a voluntary or purposeful effort to do business in Florida"]; *Milberg Factors, Inc.* v. *Greenbaum* (Fla.Dist.Ct.App. 1991) 585 So.2d 1089, 1092 [same].)

Further, plaintiffs failed to demonstrate a "substantial nexus or connection" between the act of filing the financing statement and plaintiffs' claims. (See *Vons Companies, Inc.* v. *Seabest Foods, Inc., supra,* 14 Cal.4th at p. 456.) Plaintiffs' complaint alleges petitioners participated in a scheme to defraud plaintiffs by selling the pay telephones to Amtel and by extending credit to Amtel, knowing that Amtel's investment program was fraudulent. The financing statement does not, on its face, "arise out of" or have any "substantial connection" to these claims. Plaintiffs attempt to make that connection by asserting petitioners knowingly filed the financing statement to intentionally eliminate plaintiffs' rights in the security. However, plaintiffs do not support this contention with any evidence. At most, plaintiffs point to the allegations of their unverified complaint, which may not be considered in establishing the requisite contacts. (See *Mansour* v. *Superior Court* (1995) 38 Cal.App.4th 1750, 1759 [46 Cal.Rptr.2d 191]; *Mihlon* v. *Superior Court, supra,* 169 Cal.App.3d at p. 710.)

Plaintiffs additionally argue jurisdiction is appropriate because petitioners' out-of-state conduct caused an " 'effect' " in California, i.e., injury to the plaintiffs. (See *Sibley* v. *Superior Court* (1976) 16 Cal.3d 442, 445-446 [128 Cal.Rptr. 34, 546 P.2d 322]; *Brown* v. *Watson* (1989) 207 Cal.App.3d 1314 [255 Cal.Rptr. 507].) However, the mere causing of an effect " 'is not necessarily sufficient to afford a constitutional basis for jurisdiction . . . .' " (*Edmunds* v. *Superior Court* (1994) 24 Cal.App.4th 221, 230 [29 Cal.Rptr.2d

281].) Jurisdiction may be invoked only where the actor committed an out-of-state act intending to cause effects in California or reasonably expecting that effects in California would result. (*Farris* v. *Capt. J.B. Fronapfel Co.* (1986) 182 Cal.App.3d 982, 990 [227 Cal.Rptr. 619]; *Kaiser Aetna* v. *Deal* (1978) 86 Cal.App.3d 896, 904 [150 Cal.Rptr. 615]; see *Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at p. 476 [105 S.Ct. at p. 2184] [If an "actor's efforts are '*purposefully directed*' toward residents of another State . . . , an absence of physical contacts [cannot] defeat personal jurisdiction there" (italics added)].)

Plaintiffs failed to proffer any *evidence* showing petitioners committed their acts (executing the contract and related agreements and financing statement) with the intention or expectation the documents would have an "effect" in California. The most we can glean from the record is that petitioners must have known the sales agreement would increase the supply of telephone units to be sold by Amtel, a California corporation. However, this would be true with respect to any sale to a California business. Petitioners' knowledge that Amtel would have a greater supply of its product to sell to customers does not show petitioners purposefully or intentionally caused an effect in California so as to establish sufficient minimum contacts. Likewise, Goehring's filing of the California UCC-1 financing statement does not demonstrate he acted intentionally to cause an effect in California. Absent additional facts (such as that Goehring was aware Amtel was misrepresenting that the telephone units were unencumbered by any other security interest), the filing of the statement does not lead to a reasonable inference of the requisite knowing and purposeful conduct.

To demonstrate petitioners knew they were causing an "effect" in California, plaintiffs rely exclusively on their unverified complaint. These allegations cannot be used to establish jurisdiction. (See *Mansour* v. *Superior Court, supra,* 38 Cal.App.4th at p. 1759.) ■ A "plaintiff need not prove the truth of the [complaint's] allegations . . . to justify an exercise of jurisdiction over nonresident parties, but the plaintiff must 'present facts demonstrating that the conduct of defendants related to the pleaded causes is such as to constitute constitutionally cognizable "minimum contacts."'" (*Edmunds* v. *Superior Court, supra,* 24 Cal.App.4th at p. 228.)[3]

■ Finally, plaintiffs' reliance on *Brown* v. *Watson, supra,* 207 Cal.App.3d 1306 is misplaced. In *Brown,* the court held a California court

---

[3]Contrary to plaintiffs' counsel's suggestions at oral argument, *Calder* v. *Jones, supra,* 465 U.S. 783, did not state or suggest that a plaintiff may rely on his or her unverified complaint to establish the scienter element. In *Calder,* entertainer Shirley Jones (a California resident) brought a libel action against two Florida residents, the writer and editor of a National Enquirer article. The court held the California court had jurisdiction over petitioners since defendants "knew [the article] would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by [Jones] in the State in which she

could properly exercise jurisdiction over Texas attorneys in a malpractice action asserted by a California resident. Stressing the Texas attorneys had communicated with plaintiffs and their local attorneys during a four-year period, the court found the attorneys "purposefully availed themselves of the privilege of conducting activities in California by their decision to represent [the plaintiffs] and their subsequent conduct." (*Id.* at p. 1314.) There was no similar purposeful conduct between petitioners and California.[4]

Taking a different approach, plaintiffs argue petitioners were not merely acting as general partners, but rather were "doing business as" Texas Coinphone. Plaintiffs rely on certain leasing documents between Texas Coinphone and third parties that were attached to the August 1994 Amtel-Coinphone sales agreement. Although Goehring and Catalena signed the leases in their capacity as general partners of Texas Coinphone, the documents refer to Goehring and Catalena as "dba Texas Coinphone." In their declarations, petitioners state the lease references to the "d/b/a" are "incorrect" and that they are general partners of Texas Coinphone. In its ruling, the trial court necessarily found petitioners credible on this point because it specifically identified petitioners as "general partners" of Texas Coinphone. We are required to accept this factual finding since it is supported by substantial evidence. (*Pennsylvania Health & Life Ins. Guaranty Assn.* v. *Superior Court* (1994) 22 Cal.App.4th 477, 480 [27 Cal.Rptr.2d 507].)[5]

We conclude plaintiffs did not sustain their burden of showing petitioners had sufficient contact with this state to permit the trial court to exercise jurisdiction over them. Without minimum contacts, the interests of the plaintiffs and/or of the state in providing a local forum do not warrant the imposition of jurisdiction over the individual defendants.

---

lives and works and in which the National Enquirer has its largest circulation." (*Id.* at pp. 789-790 [104 S.Ct. at p. 1487].) Here, there was no evidence showing petitioners knew their conduct in entering into a sales agreement with Amtel and filing the UCC-1 statement would adversely impact a California resident.

[4]The Ninth Circuit has questioned the validity of *Brown*'s conclusion that such communications between an out-of-state attorney and his California clients establish constitutionally sufficient minimum contacts. (*Sher* v. *Johnson, supra,* 911 F.2d at p. 1363, fn. 2.)

[5]We decline plaintiffs' request that we take judicial notice of a document that was never filed in the superior court—a proof of claim form filed by Texas Coinphone on December 18, 1995, in the United States Bankruptcy Court. As our Supreme Court recently reiterated, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc.* v. *Seabest Foods, Inc., supra,* 14 Cal.4th at p. 444, fn. 3.) Absent exceptional circumstances, an appellate court will only consider matters that were part of the record below. (*Ibid.*) No exceptional circumstances existed here. Further, even if we were to consider the bankruptcy document, it would add nothing to plaintiffs' arguments.

### III. *Plaintiffs' Right to Discovery*

In opposing petitioners' motion to dismiss, plaintiffs asked to conduct jurisdictional discovery if the trial court considered granting petitioners' motion. The court never reached the issue because it determined there were sufficient minimum contacts on the record before it. Plaintiffs now reiterate their request that they be provided the opportunity to conduct discovery if this court finds the record does not support the trial court's jurisdictional ruling.

The trial court should be given the opportunity to rule on this issue. ▮▮▮▮ A plaintiff is generally entitled to conduct discovery with regard to a jurisdictional issue before a court rules on a motion to quash. (See *Mihlon* v. *Superior Court, supra*, 169 Cal.App.3d at p. 711.) The granting of a discovery request "lies in the discretion of the trial court, whose ruling will not be disturbed in the absence of manifest abuse." (*Beckman* v. *Thompson* (1992) 4 Cal.App.4th 481, 487 [6 Cal.Rptr.2d 60].) Under the circumstances, the trial court should be provided the opportunity to exercise its discretion to determine whether jurisdictional discovery pertaining to petitioners would be appropriate in this case.

### DISPOSITION

Petition granted. Let a writ of mandate issue directing the superior court to vacate the order denying the motion to dismiss. The court should thereafter rule on plaintiffs' request for discovery. If the court exercises its discretion to deny discovery, the court should enter an order granting petitioners' motion to dismiss. If the court exercises its discretion to permit discovery, the court should (1) consider any additional submitted evidence; and (2) rule on petitioners' motion to dismiss in light of the entire factual record and in light of the principles set forth in this opinion.

Petitioners to recover costs from plaintiffs.

Nares, Acting P. J., and McIntyre, J., concurred.